FILED
IN THIS OFFICE
NOV 19 2026
Clerk U.S. District Court
Greensboro, NC
BY

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

**CLAUDIA A. MINOIU,**
Plaintiff,
v.
**CITY OF DURHAM, NORTH CAROLINA; JANE DOE OFFICER 1, in her individual capacity; JOHN DOE OFFICERS 2 and 3, in their individual capacities; HEART RESPONDERS 1 and 2, in their individual capacities; JANE DOE PANERA MANAGER, in her individual capacity; JANE DOE PANERA SUPERVISOR, in her individual capacity; and PANERA BREAD OPERATING ENTITY, d/b/a PANERA BREAD, 737 NINTH STREET, DURHAM, NORTH CAROLINA**
Defendants.

Civil Action No. 1:26-cv-1373

# COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF

(42 U.S.C. § 1983; Fourteenth Amendment; Supplemental State-Law Claims)

| | |
|---|---|
| **COUNT I** | 42 U.S.C. § 1983 (Civil Conspiracy) — Fourteenth Amendment (Equal Protection) and Fourth Amendment (Unlawful Seizure and Excessive Force) |
| **COUNT II** | 42 U.S.C. § 1983 — Fourth Amendment (Unconstitutional Seizure and Use of Force Following Plaintiff's Compliance with the Trespass Warning) |
| **COUNT III** | 42 U.S.C. § 1983 — Fourteenth Amendment (Substantive Due Process): Conscience-Shocking Pursuit and Ditch Conduct |
| **COUNT IV** | North Carolina Common-Law Assault |
| **COUNT V** | 42 U.S.C. § 1983 — Joint Participation by Private Defendants (Panera Manager and Supervisor) |
| **COUNT VI** | 42 U.S.C. § 1983 — Municipal Liability (City of Durham) |
| **COUNT VII** | Intentional Infliction of Emotional Distress (North Carolina Common Law) |
| **COUNT VIII** | North Carolina Constitution, Article I, § 19 |
| **COUNT IX** | 18 U.S.C. § 2261A — Stalking |
| **COUNT X** | Civil No-Contact Relief (N.C.G.S. ch. 50C; motion under § 50C-2(a)). |

## I. NATURE OF THE ACTION

1. Plaintiff Claudia A. Minoiu, Esq., an attorney licensed in North Carolina, brings this action arising from events of November 14, 2026, at and near Panera Bread, 737 Ninth Street, Durham, North Carolina. The events began with a police-delivered trespass warning and escalated — across three encounters over ninety minutes, each one initiated by the Defendants' side — into a foot pursuit through public streets, down stairways, and into a wooded ditch, where Plaintiff concealed herself, in freezing temperatures, for approximately three to four hours while officers searched for her with flashlights and threw an object against the ditch wall beside her position to induce her to walk out of the ditch.

2. Each escalation in this sequence was chosen, and each simpler de-escalation was bypassed. No one — not the Panera manager, not any officer — ever asked Plaintiff to leave, stated a reason for her exclusion, or warned her of any consequence, at any point on November 14 or in the preceding week. The first words spoken to her were a state-issued trespass declaration and a demand for identification.

3. Plaintiff seeks: (1) compensatory damages for physical and emotional injuries under 42 U.S.C. § 1983 (*Carey v. Piphus*, 435 U.S. 247, 254–64 (1978)); (2) punitive damages under § 1983 against the individual defendants, whose conduct was motivated by evil motive or intent and evidenced reckless or callous indifference to Plaintiff's federally protected rights (*Smith v. Wade*, 461 U.S. 30, 51–56 (1983)), and, as to the state-law claims, punitive damages under N.C.G.S. § 1D-15; (3) declaratory relief under 28 U.S.C. § 2201(a) that the officers' conduct violated Plaintiff's constitutional rights; (4) attorney's fees and costs under 42 U.S.C. § 1988 to the extent permitted; (5) judgment on the federal constitutional claims — the Equal Protection class-of-one conspiracy claim, the Fourth Amendment unlawful-seizure and excessive-force claims, and the substantive-due-process claim (*Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Torres v. Madrid*, 592 U.S. 306, 317 (2021); *County of Sacramento v. Lewis*, 523 U.S. 833 (1998)); (6) judgment on the state-law claims of assault and intentional infliction of emotional distress against the participating individual defendants (*Dickens v. Puryear*, 302 N.C. 437, 445, 276 S.E.2d 325, 330–31 (1981); *Waddle v. Sparks*, 331 N.C. 73, 82–83, 414 S.E.2d 22, 27 (1992)); (7) municipal liability against the City of Durham under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for dispatch and pursuit practices that deviated from the City's own published crisis-response standards; and (8) judgment against the Panera defendants for their knowing, real-time participation in the police response (*United States v. Price*, 383 U.S. 787, 794 (1966); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970); *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980)).

4. Plaintiff demands disclosure of the dispatch and call records that will establish what was said, by whom, to summon armed officers and unarmed crisis responders to a quiet customer, and why the City's own crisis-response criteria were not followed.

## II. JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over the federal claims arising under the Constitution and 42 U.S.C. § 1983, and supplemental jurisdiction under 28 U.S.C. § 1367 over the state-law claims arising from the same events.

6. Venue is proper under 28 U.S.C. § 1391(b) because the events occurred in Durham County, North Carolina, within this District.

## III. PARTIES

7. Plaintiff Claudia A. Minoiu is an individual residing in North Carolina, an attorney admitted to practice in North Carolina, and a former employee of Panera Bread. *See* Exhibit R.

8. Defendant City of Durham is a North Carolina municipal corporation and the employer of the Durham Police Department ("DPD"), the Durham Community Safety Department ("DCSD"), and the Durham Emergency Communications Center.

9. Defendant Jane Doe Officer 1 is the uniformed female DPD officer who delivered the trespass warning to Plaintiff inside Panera Bread on the evening of November 14, 2026, and demanded her identification.

10. Defendants John Doe Officers 2 and 3 are the two male DPD officers who, at approximately 9:31PM on November 14, 2026, charged at Plaintiff on sight, shouting "come here, you jerk," initiating the foot pursuit that ended at the wooded ditch.

11. Defendants HEART Responders 1 and 2 are the two personnel of the City's Holistic Empathetic Assistance Response Teams who accompanied Officer 1 into the restaurant, approached Plaintiff in a rushed and confrontational manner, and participated in her removal.

12. Defendant Jane Doe Panera Manager is the female manager on duty on November 14, 2026, and a participant in the October 29, 2026 and November 7–8, 2026 incidents described below.

13. Defendant Jane Doe Panera Supervisor is the manager's supervisor who accompanied her during the November 7–8, 2026 threat to trespass Plaintiff.

14. Defendant Panera Bread Operating Entity is the entity operating the restaurant at 737 Ninth Street, Durham, North Carolina, whose identity will be confirmed through investigation and discovery. All Doe defendants will be identified through the public-records requests, subpoenas, and discovery described herein.

## IV. STATEMENT OF FACTS

### A. Background: a documented customer, a pattern of targeted exclusion and seizure

**15.** Plaintiff was a regular customer and a dues-paying member of Panera Bread's Unlimited Sip Club; her subscription was active on November 1, 2026 (Exhibit H) and renews November 30, 2026. Panera sells this membership on the premise of unlimited beverages during visits — that is, Panera's own product invites the precise conduct for which Plaintiff was later expelled: staying, working, and refilling.

**16.** Plaintiff previously worked for Panera Bread and lawfully owns Panera apparel from that employment (Exhibit R).

**17.** On October 29, 2026, at approximately 7:00PM, while Plaintiff was finalizing a federal civil-rights complaint at the Ninth Street Panera (she was working against a courier deadline to file what became *Minoiu v. D. Burnside*, No. 1:26-cv-01283 (M.D.N.C.)), the manager approached her and stated it was "illegal" to wear a Panera T-shirt in the restaurant — a shirt Plaintiff owned from her own prior employment there — and directed her to "cover up," language open to interpretation, i.e., inferring accusation of indecency in a public place. Plaintiff responded in a friendly manner, noting that she used to work at Panera; the manager then presented a handwritten notice: "Please change your shirt to be covered up or leave the store" (Exhibit G). The stated ground was attire and former-employee status — not conduct. The notice contained no no-return directive. Plaintiff changed her shirt and complied.

**18.** On or about November 7–8, 2026, the same manager, accompanied by her supervisor, approached Plaintiff while she worked quietly on her computer and stated, in words to the effect of "you will be trespassed," without stating any reason or giving a vague reason that the Plaintiff cannot remember, and without any disturbance by Plaintiff. This was a conditional future threat, not a delivered notice of exclusion; no conduct by Plaintiff preceded it other than working on her computer as a customer.

**19.** On November 13, 2026 — one day before the events at issue — Panera served Plaintiff lunch at this same location, where she met a former professor of hers from Duke Law School (Exhibit I). By serving her, the store re-extended any license to enter; no standing exclusion existed.

**20.** On October 30, 2026, Plaintiff filed *Minoiu v. D. Burnside* against a Duke University Campus police officer. Duke University Police is a private university police department, not a division of the Durham Police Department.

### B. November 14, 2026 (8:04–8:15PM: trespass warning, identification demand, and the rushed removal

**21.** On November 14, 2026, Plaintiff spent the day at the Ninth Street Panera as a customer, working on a court filing on her computer, with a single gym bag beside her. At no point was she loud, disruptive, or disorderly; surveillance footage from the restaurant, which Plaintiff has demanded be preserved, will confirm this.

**22.** At approximately 8:04PM, Officer 1 and two HEART responders entered and approached Plaintiff (Exhibit B; timeline). The first words spoken to her by anyone that evening were words to the effect of: "You are trespassed from this property," followed immediately by a demand for her identification.

**23.** Plaintiff declined to provide identification and asked why. North Carolina has no stop-and-identify statute; a person not suspected of a crime is not required to identify herself to police, and no reason was given for the demand.

**24.** Plaintiff stated that she felt taken aback by the manner of the approach and that she intended to report the incident. At approximately the same time, the HEART responders approached Plaintiff suddenly and in a rushed, confrontational manner, moving into close physical proximity to her — close enough that Plaintiff, gathering her belongings in mounting fear, had no time to organize them. One stated words to the effect of, "You're hooked up with resources, sweetie?!" in a tone Plaintiff experienced as threatening and sarcastic. Trespass and welfare are mutually exclusive acts: a business excludes the person it wants gone and connects to resources the person it believes needs help; the two were performed on Plaintiff simultaneously, in the same breath.

**25.** Officer 1 tapped her body-worn camera and stated words to the effect of, "I am recording you right here." Plaintiff perceived the gesture as an escalation rather than an explanation.

**26.** Frightened by the combined approach, Plaintiff gathered her belongings in haste. Because of the speed with which the responders moved in, she was unable to organize her belongings; she temporarily set items, including her computer mouse, on the ground at the entrance as she exited. The entrance area is the shopping center's common walkway fronting the parking field; regardless of ownership, Plaintiff was in the act of promptly leaving after notice — the opposite of trespass, which criminalizes remaining, not exiting. The HEART responders followed her out; one stated words to the effect of, "You're still on Panera property, ma'am." Plaintiff retrieved her belongings from the ground and walked away as quickly as she could.

**27.** No one gave Plaintiff a written explanation, a report number, or any responder's name. Plaintiff was not told she could remain to finish; she was not told why any of this was happening; and she was never — that evening or any other — asked to leave by any Panera employee.

### C. 8:17–8:28PM: the return for dropped property, and the store's response

**28.** Approximately twenty minutes later, at approximately 8:17PM, Plaintiff returned to the entrance area to retrieve her computer mouse — property she had dropped moments earlier because of the rushed removal the Defendants' conduct had caused. She asked to speak with the manager and sought the name of the female officer who had trespassed her.

**29.** The manager hid from her — turning away and moving out of Plaintiff's sight rather than speaking. Employees, rather than answering, took out their phones and recorded her; some laughed (Exhibit C: photographs timestamped 8:19–8:28PM). One employee stated words to the effect of "you cannot be in here" and, when Plaintiff asked why, refused to answer and continued filming. The mouse retrieval took moments; the request for a name was lawful. The response to both was a telephone.

**30.** Plaintiff was a paying member whom the store had served lunch the day before. The manager had every available humane option — hand over the mouse, say "wait outside and I'll bring it to you," or say "leave or I'll call the police." She selected none. What the telephone could provide that a sentence could not was identification, documentation, and state force.

### D. 9:21–9:31PM: live tracking, the employees held in place, and the charge

**31.** From approximately 9:21PM, Plaintiff recorded video ("Chased by Police," *See* **Exhibit A**). The video shows the manager inside the closed store, telephone headset in hand, repeatedly turning to look at Plaintiff's position outside on the Ninth Street-facing side, adjacent to the entrance of the neighboring restaurant, Juju. During this call, Plaintiff heard the manager state words to the effect of: "she's outside on the 9th street-facing side" — a live location report to whoever was on the other end of the line.

**32.** Over the course of the call, the video documents a sequence of visual checks by the manager — turning, peering around the wall divider, and re-emerging — consistent with monitoring Plaintiff's position while others moved. Employees remained in the store rather than departing for the night; as officers approached the entrance area (the Harris Teeter/parking-lot side), an employee confirmed with the manager that it was clear to leave, and employees then filed out through the door as officers arrived at it (Exhibit A, video minutes 6:08–6:24). Plaintiff, who had stood outside after closing hours doing nothing but ask for a name, was the only person held in place.

**33.** At approximately 9:31PM (video minute 6:31), as Plaintiff — having left the porch area — rounded the corner walking toward Harris Teeter, two male officers appeared from the opposite side, marching decisively toward the corner she had just vacated. Upon seeing her, they immediately broke into a run, one shouting words to the effect of: "You! Come

here, you!" and "come here, you jerk." Plaintiff's video captures the running and the officers' shouted pursuit.

34. Plaintiff fled in terror. She was too frightened to seek help from a passing motorist, believing the officers would be believed over her. The video documents her sprint along the route — down the Ninth Street stairways, across the road, past the Computer Cellar corner, into the alley area — ending at the wooded ditch approximately twenty seconds later (Exhibit A, video minutes 6:31–7:10).

### E. The ditch: flashlights, the thrown object, and three hours in the cold

35. Concealed beneath dense shrubs in the ditch, Plaintiff heard footsteps approach. Officers shone flashlights into the ditch area, searching. Plaintiff heard sounds of objects being directed at the ditch, as if to drive her out. Approximately ten minutes into the search, Plaintiff heard a distinct impact — an object striking the ditch wall immediately beside her position. She could not see who threw it. She crawled deeper into the vegetation, on her knees, and remained frozen in a single crouched position, motionless and silent, for approximately three to four hours as the overnight temperature fell toward the mid-30s (Exhibit M: first-freeze night; Plaintiff's device recorded 44°F at 8:48PM).

36. Plaintiff believed that if she were seized, she might not survive the encounter. She did not use her phone, move, or make a sound, because she believed any indication of her position would result in her being seized. She did not call 911: in Durham, a 911 call is answered by the same Emergency Communications Center that dispatches the officers she was hiding from. She remained until she heard complete silence, and she stayed in hiding for hours afterward, avoiding police vehicles.

37. Plaintiff sustained a puncture wound to her palm with embedded gravel and dirt from falling on her hands at speed on the gravel stairs during the flight (Exhibit F), and sustained severe emotional distress. She had carried her iPhone and the recovered mouse in her hands throughout the flight. The following day she returned to the ditch area and photographed and retrieved her computer mouse where it had fallen (Exhibit E).

38. Plaintiff was never arrested, never cited, never charged, and never given any explanation of the legal basis for the pursuit. Under North Carolina law, no arrest power existed at any relevant moment: the trespass warning had been fully satisfied by her instant compliance; she was off the premises and departing when seen; and N.C.G.S. § 15A-401(b)(2) permits warrantless misdemeanor arrest only for offenses committed in an officer's presence, which none was. For a Class 3 misdemeanor such as trespass, the statutory default is a citation to appear, not arrest. N.C.G.S. § 15A-302.

### F. The City's own standards establish the deviation

**39.** The City publicly defines its crisis-response tiers. The Co-Response unit — clinician plus police officer — is dispatched, by the City's own published FAQ, only to "9-1-1 calls about mental health crises or other quality of life concerns that have a higher risk for violence." Thus, only if crisis and violent or dangerous situation – a more qualified team formula will be dispatched (**Exhibit J**). In contrast, the unarmed three-person Durham Community Response Team is dispatched to nonviolent calls including trespass and welfare checks; the City's triage is automated by call-nature code with conditional logic, leaving call-takers no discretion (**Exhibit L**).

**40.** The City's own program data describe the expected disposition of such calls: most Community Response Team encounters are resolved on scene, approximately two percent are referred to police, and less than one percent result in arrest (**Exhibit L**). Plaintiff's call — whatever its coding — produced the statistical opposite: an officer-led team, an identification demand on a compliant customer, a second call, a live location report, and a foot pursuit of a departing person who committed no offense in any officer's presence.

**41.** The City's Community Safety Department also operates an Involuntary Commitment Response Team — a clinician and an EMT dispatched for on-site evaluations "in situations that may require involuntary commitment" (**Exhibit K**). The identification demand, the "resources" inquiry by crisis responders, and the clinician-staffed response are consistent with an intake framing applied to a woman who exhibited no crisis behavior of any kind — a customer working on a laptop.

### G. Evidence, preservation, and records

**42.** Plaintiff possesses the flight video with audio of the officers' shouts; timestamped photographs of the HEART responder at the exit (8:08PM), of employees recording her (8:19–8:28PM), of the manager at the window during the 9:21PM call; photographs of the ditch, the recovered mouse, her palm wound, the October 29 handwritten notice, her Sip Club membership, the November 13 lunch confirmation, her prior Panera employment records, the location photographs and route maps, and the weather table.

**43.** On November 17, 2026, Plaintiff served public-records requests on the City of Durham under N.C.G.S. § 132-1 et seq., a disclosure request under N.C.G.S. § 132-1.4A(c) for body-worn camera footage, and a petition under § 132-1.4A(f) for its release. Plaintiff seeks preservation of all 911 recordings, CAD dispatch records and call-nature codes, radio traffic, body-worn camera footage, HEART response and clinician records, trespass-warning documentation, incident reports, dispatch and pursuit policies, and the names, titles, and unit assignments of all responders.

44. Plaintiff has demanded preservation of Panera Bread surveillance footage, point-of-sale and Wi-Fi connection records, and the manager's and employees' communications and phone records from October 27 through November 15, 2026.

## V. CLAIMS FOR RELIEF

### A. COUNT I — 42 U.S.C. § 1983 Civil Conspiracy — Fourteenth Amendment (Equal Protection) and Fourth Amendment Unlawful Seizure and Excessive Force[1]

**45.** Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

**46.** The Fourteenth Amendment to the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Although the text applies directly to states, Courts also enforce equal protection principles against the federal government through the Fifth Amendment's Due Process Clause.

**47.** The Equal Protection Clause guarantees that similarly situated individuals shall be treated alike, and prohibits intentional and arbitrary discrimination by governmental officials, as well as private individuals and private businesses for either performing a traditional government function or acting in concert with the state. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).

**48.** The constitutional protections of the Equal Protection Clause of the Fourteenth Amendment to the US Constitution extend to individuals who are intentionally singled out for adverse, arbitrary, and malicious treatment. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (creating a distinct, stand-alone protected "Class-of-One" Equal Protection classification, also referred to as "arbitrary animus").

**49.** In this case, the Plaintiff's facts establish arbitrary and malicious animus, a form of intentional discrimination targeting a single individual maliciously and without a lawful basis. Evidence of arbitrary vindictiveness or animus in this case is compelling and sufficient to establish a class-of-one equal protection claim where state action is "motivated solely by a 'spiteful effort to "get" him for reasons wholly unrelated to any legitimate state objective.'" *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 563 (2000) (quoting *Esmail v. Macrane*, 53 F.3d 176, 180 (7th Cir. 1995)). Furthermore, independent proof of "subjective ill will" is not required where the Plaintiff demonstrates that the private individual/business' state-sponsored action or the action of the state itself "motivated solely by a 'spiteful effort' to get him'", was "irrational and wholly arbitrary." *Id.* at 563–65.

**50.** The Fourteenth Amendment's state-action requirement extends to private individuals who knowingly and willfully participate with governmental officials in conduct depriving another person of constitutional rights. *United States v. Price*, 383 U.S. 787 (1966) (private individuals can participate in a conspiracy involving state officials.) Here, Panera's private employees acted jointly with Durham Police Department officers, Holistic

[1] Applied to state and local officials through the Fourteenth Amendment.

Empathetic Assistance Response Team, to accomplish the unlawful exclusion, seizure, and use of force.

**51.** In *United States v. Price*, the Supreme Court upheld the application of § 241 to a conspiracy involving the murder of civil-rights workers in Mississippi. In *United States v. Price*, 383 U.S. 787, 794 (1966), the Supreme Court held that acting "under color of law" does not require public office: "It is enough that he is a willful participant in joint activity with the State or its agents." The Court recognized the corresponding application of this principle to civil actions under 42 U.S.C. § 1983. Id. at 794 n.7 ("In cases under § 1983, 'under color of law' has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment").

**52.** Likewise, in *Adickes v. S.H. Kress & Co.*, the Supreme Court recognized that a restaurant employee who reaches an understanding with a police officer to deprive a customer of constitutional rights may be held liable under § 1983. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). *See also Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980) (recognizing liability where private individuals willfully participate in joint unconstitutional action with state officials).

**53.** To act "under color of law" does not require that the accused be an officer of the State. The protections of the U.S. Constitution extend to individuals and businesses. According to *United States v. Price*, it is enough that such individual and/or business is "a willful participant in joint activity with the State or its agents." *United States v. Price*, 383, 794-795 (1966). The protections of the United States Constitution are so strong that private individuals choosing to assist/collaborate/participate or in any way partake in unlawful/malicious/hate-motivated state or government action may be criminally charged with a felony. *See Id.* (referencing "an indictment charging all appellees with a conspiracy in violation of 18 U.S.C. § 241, making it a felony to conspire to interfere with a citizen in the free exercise or enjoyment of any right secured or protected by the Constitution or laws of the United States.")

**54.** With respect to the Panera "trespass," Plaintiff was not excluded for what she did — which was nothing — but for what the Defendants' side decided she was. The response dispatched to her was a behavioral-health response: two HEART crisis responders, a sarcastic "Are you hooked with resources sweetie?" inquiry, and a Durham Police Department Officer tapping her body camera in a threatening manner: "I am recording you right here." Plaintiff exhibited no behavior warranting any of it: she worked on her laptop throughout the day and complied instantly with the warning. What followed was a response built entirely on a caller's unverified characterization, applied to a person whose conduct contradicted it in every observable respect, and executed through coordinated action between the store and the police — who, as in *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970), "somehow reached an understanding" by which the exclusion was accomplished through state action.

### B. COUNT II — Fourth Amendment Unconstitutional Seizure and Use of Force[2] Following Plaintiff's Compliance with the Trespass Warning

**55.** The Fourth Amendment protects individuals against unreasonable seizures of their persons. A seizure occurs when law-enforcement officers, or private individuals acting under "color of law," intentionally restrain a person's freedom of movement or personal liberty, either through physical force or through a coercive show of authority to which the person submits in terror under the duress of imminent life-ending circumstances created by the state either directly or indirectly, intentionally or unintentionally.

**56.** A show of authority is coercive when, considering the totality of the circumstances, a reasonable person would not feel free to terminate the encounter, including where officers surround the individual, issue threatening commands, or otherwise communicate that compliance is compulsory. *United States v. Mendenhall*, 446 U.S. 544, 554–55 (1980) ("a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave). In *Mendenhall*, the Supreme Court identified the threatening presence of multiple officers and coercive language or tone as circumstances indicating that a reasonable person would not feel free to leave. 446 U.S. at 554–55. Here, Plaintiff alleges precisely such circumstances: multiple officers encircled her inside Panera Bread, accompanied by threats and threat of police authority to immediately arrest and involuntarily commit her.

#### *i. The Dispatched Mix (2 Heart Response Team + 1 police officer)*

**57.** Indeed, the 3-member responder team consisting of 1 police officer + 2 HEART personnel that was dispatched to Panera Bread reveals the call type — Durham Community Safety Department (DCSD) Holistic Empathetic Assistance Response Team (HEART) = crisis/welfare dispatch (also responding to nonviolent mental health crisis, suicide threat, trespass, intoxication, welfare checks), and matches the formula of the Involuntary Commitment Response Team (IRT), which features a joint response model with the Durham Police and Community Safety departments to handle crisis situations.

**58.** The City's website regarding Involuntary Commitment (IVC) Protocol, corroborates this mixed-team approach. Under HEART's Involuntary Commitment Response Team (IRT) pilot, a clinician and an EMT respond alongside law enforcement [*only*] when requested by first responders on the scene. Law enforcement still handles the legal custody and transport aspects of an IVC order, while the HEART clinician conducts the on-site first evaluation.

[2] Applied to state and local officials through the Fourteenth Amendment.

59. According to the May 31, 2023 Durham Holistic Empathetic Assistance Response Teams (HEART) Pilot Program Report (prepared by RTI International for the Durham Community Safety Department, covering June 28, 2022, through March 31, 2023), self-initiated responses to involuntary commitments occurred through the Co-Response Team (COR) rather than the unarmed Community Response Team (CRT).

60. On the facts of this case, even if the call had been coded as trespass or welfare, the City's own criteria required the unarmed three-person team: clinician, peer specialist, EMT — no police officer. The officer-led mixed team was a deviation under any possible coding.

61. The configuration therefore tells its own story. What arrived at Panera Bread looked like an involuntary-commitment response — police custody with clinicians attached — and it produced exactly what such a response produces when the person meets no commitment criteria: a police chase and an attempted seizure with no lawful basis.

62. **Hodari D. and Seeking an Extension of Torres**—In *Torres v. Madrid*, 592 U.S. 306, 317–18 (2021), the Supreme Court held that physical force applied to the body with intent to restrain constitutes a seizure even when the person escapes. Although Torres concerned actual physical contact and did not eliminate the submission requirement for seizures accomplished solely through a show of authority, Plaintiff urges an extension of its underlying recognition that successful apprehension is not invariably necessary to establish a Fourth Amendment seizure. Plaintiff argues that Durham Police Department's unlawful pursuit, deliberately calculated to seize the Plaintiff and confine a person to a place of danger, presents constitutional concerns warranting consideration beyond the ordinary pursuit addressed in Hodari D.

63. In *California v. Hodari D.*, the US Supreme Court stated as follows: "The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not." *Hodari D.* does not preclude Plaintiff from establishing that a seizure occurred during the subsequent (9:21PM) pursuit. [3]

64. During this additional attempt at seizure of the Plaintiff's person, Durham Police Department officers chased her down Ninth Street, and engaged in conduct that induced such extreme psychological terror to the point that she ran for her life all the way down 9th Street, turned the corner at Computer Cellar, jumped into a brush-choked gully, where she remained concealed for approximately four hours, frozen in tonic immobility position.

65. As alleged in the statement of facts, a team composed of one Durham Police Officer and two Holistic Empathetic Assistance Response Team (HEART) personnel, all females, encircled Plaintiff inside Panera Bread. The officers' collective positioning and

[3] See Exhibit for Timeline.

accompanying threats constitute a coercive show of governmental authority sufficient to constitute a Fourth Amendment seizure.

**66.** The Supreme Court has expressly recognized that the threatening presence of multiple officers, physical obstruction, and language indicating compelled compliance are circumstances relevant to determining whether a reasonable person would believe herself free to leave. *Mendenhall*, 446 U.S. at 554–55.

**67.** Plaintiff had already complied with the directive to leave Panera Bread and was physically outside the establishment when Durham police officers pursued, confronted, and forcibly seized her. At that point, Plaintiff was no longer on the premises, was not refusing to depart, and was not engaged in conduct presenting an imminent threat to the officers or others. Notwithstanding Plaintiff's compliance, the officers subjected her to an unjustified physical seizure and use of force, without reasonable suspicion of ongoing criminal activity, probable cause for arrest, or any objectively reasonable necessity for physical restraint.

**68.** Plaintiff alleges that the officers' conduct constituted an unreasonable seizure and excessive use of force in violation of the Fourth Amendment, applicable to the States through the Due Process Clause of the Fourteenth Amendment to the US Constitution, actionable under 42 U.S.C. § 1983. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (requiring objective reasonableness in evaluating police use of force, including consideration of the severity of the suspected offense, whether the individual posed an immediate threat, and whether the individual was actively resisting or attempting to evade arrest);

**69.** *See also* (1) *Torres v. Madrid*, 592 U.S. 306, 317 (2021) (recognizing that physical force applied with intent to restrain constitutes a seizure under the Fourth Amendment); (2) predicate seizure at the restaurant making threats analyzable as force in the manner of the seizure by encirclement (*Robinson v. Solano County*, 278 F.3d 1007 (9th Cir. 2002); *Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009) — note these presuppose a seizure; 4th Cir. has not so extended).

**70. Durham Police Department Officers chasing the Plaintiff, yelling at her "come here you! Come here you jerk!" and chasing her all the way down 9th Street until she jumped and hid in a ditch for 3-4 hours, throwing a stone in the direction of the hiding place to flush her out and get her to surrender, and in so doing, instilling life-threatening terror, amounts to seizure even though police failed to accomplish physical seizure**—In *Torres v. Madrid*, the Tenth Circuit held that "a suspect's continued flight after being shot by the police negates a Fourth Amendment excessive-force claim." The Supreme Court vacated, holding that "[a] seizure requires the use of force with intent to restrain, as opposed to force applied by accident or for some other purpose. *The inquiry*

*is whether the challenged conduct objectively manifests an intent to restrain.*" (Emphasis added).

71. In Torres, the person did not realize that the police officers were there to arrest her, so she got scared and ran away, at which point the officers seized Torres by shooting her with the intent to restrain her movement. Torres managed to escape and drove to a hospital 75 miles away, only to be airlifted back to a hospital in Albuquerque, where the police arrested her the next day. The Supreme Court decided that the police conduct was sufficient to constitute a "seizure" under the Fourth Amendment, even though no actual physical seizure was effectuated.

72. The Plaintiff's facts are similar to the ones in Torres, in that the Plaintiff, as Torres, escaped an unlawful attempted arrest, even though the facts, thankfully do not also include a physical seizure, though the police did chase the Plaintiff all the way to the 9 Alley ditch, and threw a stone directed at the Plaintiff's hiding location at the wall of the ditch in order to scare her and flush her out and surrender to the unlawful arrest. *See* **Exhibit T** for Affidavit for further details on how the Plaintiff managed to miraculously escape.

73. Thus, the Plaintiff argues for an extension to *Torres*, because her successful escape that night of November 14-15, 2026 should not defeat a constitutional claim when there exists ample circumstantial evidence establishing intent on the part of the Durham Police Department to seize her person, although she was never physically touched.

74. Further, *Oliver* supports the principle that force must be proportionate to the governmental need. *Oliver v. Fiorino*, 586 F.3d 898, 903–08 (11th Cir. 2009)— as persuasive Eleventh Circuit authority, not binding in North Carolina. In *Oliver*, police officers repeatedly used a taser against a man who was not suspected of a crime and posed little threat. The Eleventh Circuit held that the extreme, disproportionate force violated clearly established Fourth Amendment protections and denied qualified immunity.

75. **Predicate Seizure at Panera Bread and Threatened Force During the Seizure**—State action is supplied jointly, and the inference of agreement is for the jury or the magistrate judge. In *Adickes v. S. H. Kress & Co.*, the Supreme Court reversed summary judgment because the store could not rule out the possibility that a policeman had been inside while the plaintiff awaited service, holding that "it would be open to a jury, in light of the sequence that followed, to infer from the circumstances that the policeman and a Kress employee had a 'meeting of the minds,' and thus reached an understanding" that the plaintiff be refused service. 398 U.S. 144, 157–58 (1970). Sandra Adickes had to ask the jury to imagine the officer in the store, on a student's testimony alone. Plaintiff asks the jury to watch: the manager's telephone call from the window; her live report of Plaintiff's position; the employees held inside until officers reached the door; and the charge the moment Plaintiff was seen.

76. Here, the meeting of the minds is documented by the Defendants' own sequence — and "private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law" *United States v. Price*, 383 U.S. 787, 794 (1966); *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980). The participating Panera employees thus acted under color of state law and are subject to § 1983 liability notwithstanding their private employment.

### C. COUNT III — 42 U.S.C. § 1983 — Fourteenth Amendment (Substantive Due Process): Conscience-Shocking Pursuit and Ditch Conduct (Officers 2 and 3)

77. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein. Officers 2 and 3 charged a departing person whom they had no authority to arrest or cite, initiating a foot pursuit at night over stairs, roadways, and rough ground, causing her flight and fall, and continuing the search once she was concealed.

78. Plaintiff recognizes that ordinary police pursuit does not violate the Fourteenth Amendment, *County of Sacramento v. Lewis*, 523 U.S. 833 (1998); this is not the ordinary case. The officers located Plaintiff's concealed position, directed objects at the ditch and then the ditch wall immediately beside her — deliberate physical action against a stationary, non-resisting, located person — and remained at her position before leaving without arrest, citation, or any lawful process. Conduct deliberately directed at a located and helpless person's position, in darkness and freezing temperatures, executed to compel her submission by force and fear, meets the conscience-shocking standard, particularly where the pursued person was known to be unarmed, and innocent.

79. Plaintiff's flight video and the officers' own body-worn cameras will corroborate the charge, the shouted commands, and the ditch-edge conduct.

### D. COUNT IV — North Carolina Common-Law Assault (Officers 2 and 3)

80. Under North Carolina law, civil assault is an intentional offer or attempt to inflict injury creating a reasonable apprehension of imminent harmful or offensive contact, with apparent present ability. *Dickens v. Puryear*, 302 N.C. 437, 276 S.E.2d 325 (1981). Two armed officers sprinting directly at a lone woman while shouting "come here, you! Come here you jerk!" is an overt act creating precisely such apprehension; Plaintiff's recorded flight at full sprint documents the reasonableness of that apprehension. The officers' privilege to use force in effecting a lawful arrest does not apply: no lawful arrest or citation was possible (¶ 38), and the manner of the charge was independently unreasonable under *Graham v. Connor*, 490 U.S. 386 (1989).

### E. COUNT V — 42 U.S.C. § 1983 — Joint Participation by Private Defendants (Panera Manager and Supervisor)

**81.** A private party acts under color of law when she is a willful participant in joint activity with state actors or conspires with them to effect a deprivation of federal rights. *Dennis v. Sparks*, 449 U.S. 24 (1980); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982); *West v. Atkins*, 487 U.S. 42 (1988). The line between a complainant and a participant is crossed by real-time, knowing facilitation of the officers' operation.

**82.** The manager crossed that line on November 14. She stood with Officer 1 as the warning and identification demand were delivered; her employees were deployed to record rather than to communicate; and at 9:21PM she delivered to responders the one thing only she possessed — Plaintiff's live position, in words to the effect of "she's outside on the 9th street-facing side" — while visually tracking Plaintiff through the window, with employees held in place until officers arrived. Each of these acts was performed in coordination with the police response and was a but-for cause of the encounter that followed. The unlawful acts effected by that cooperation are those alleged in Counts I and II. The November 7–8 threat, delivered with the supervisor, demonstrates that the November 14 exclusion was premeditated rather than spontaneous.

**83.** The Panera Operating Entity is liable for the torts of its employees committed within the scope of their employment under the respondeat superior principles of North Carolina law; it is additionally liable for its own conduct in directing and ratifying the exclusion of a dues-paying customer whom it had served the previous day, without cause.

### F. COUNT VI — 42 U.S.C. § 1983 — Municipal Liability (City of Durham)

**84.** A municipality is liable under § 1983 where the constitutional injury results from an official policy, custom, or failure to train. Monell, 436 U.S. 658. Plaintiff alleges: (a) the City's published dispatch and triage criteria were violated or overridden in the response to Plaintiff — an officer-led, clinician-staffed team to a call that, by the City's own criteria, was either a nonviolent trespass/welfare call (unarmed team) or a violence-risk call (which nothing about Plaintiff's conduct supported); (b) a practice of deploying HEART welfare responses as instruments of exclusion, whereby the program's care-framing is attached to persons a business wishes removed, on the word of the caller alone; (c) failure to train and supervise officers on the limits of pursuit and force against nonviolent, departing persons, such that two officers treated a sprinting charge over stairways at night as an appropriate response to a completed Class 3 misdemeanor at most; and (d) failure to train HEART personnel on the scope of their authority, resulting in crisis responders participating in coercive identification demands and removals rather than voluntary care.

### G. COUNT VII — Intentional Infliction of Emotional Distress (All Individual Defendants)

**85.** North Carolina recognizes IIED where conduct is extreme and outrageous, intended to cause or recklessly causing severe emotional distress, and does cause it. *Dickens*, 302 N.C.

437. The conduct alleged here — a coordinated sequence spanning more than a week, culminating in armed officers charging a woman who had asked for a name, a night flight, objects thrown at her concealed position, and hours frozen in freezing brush — transcends any single incident, and the abuse of positions of official and commercial authority aggravates the outrage. Plaintiff suffered severe distress, corroborated by contemporaneous video, by physical symptoms documented in her own device data, and by the physical injuries sustained in the flight.

### H. COUNT VIII — North Carolina Constitution, Art. I, § 19 (Officers 1, 2, &3)

**86.** As an alternative ground of state-law relief that survives dismissal of the federal claims, Plaintiff asserts direct damages liability for violation of her rights under the Law of the Land Clause. *Corum v. University of North Carolina*, 330 N.C. 761, 412 S.E.2d 276 (1992).

### I. COUNT IX — 42 U.S.C. § 1983 — Stalking Conspiracy Under Color of Law (Course of Conduct Measured Against 18 U.S.C. § 2261A and N.C.G.S. § 14-277.4A)

**87.** Plaintiff incorporates by reference all preceding allegations. Plaintiff's course-of-conduct allegations, which follow, constitute stalking within the meaning of N.C.G.S. § 14-277.4A as incorporated in N.C.G.S. § 50C-1, and independently supply the pattern of coordinated conduct underlying Counts I, V, and VII.

**88.** Congress has defined the crime of stalking as a course of conduct directed at a specific person that would cause a reasonable person to fear for her safety or suffer substantial emotional distress, committed with the intent to kill, injure, harass, or intimidate, and carried out in or affecting interstate commerce.

**89.** **18 U.S.C. § 2261A. Stalking.** North Carolina has adopted the same architecture: a course of conduct — including a course of conduct pursued "through third parties" — undertaken without legal purpose, knowing it would cause a reasonable person to fear for her safety or suffer substantial emotional distress, and causing that result. N.C.G.S. § 14-277.4A. These statutory definitions describe, with legislative precision, what was done to Plaintiff between October 29 and November 15, 2026. They supply the measuring stick for the constitutional tort pleaded in this Count: a conspiracy and joint course of conduct, carried out under color of law, to deprive Plaintiff of her constitutional rights.

**90.** The General Assembly's stated intent under § 14-277.4A(a) confirms that this course of conduct is what the statute was written to reach. The legislature found "that stalking is a serious problem in this State and nationwide"; that it "involves severe intrusions on the victim's personal privacy and autonomy"; and that it "is a crime that causes a long-lasting impact on the victim's quality of life and creates risks to the security and safety of the

victim and others, even in the absence of express threats of physical harm." N.C.G.S. § 14-277.4A(a). Each finding describes this case. The monitoring of her position by telephone and flashlight, the pursuit through public streets, and the objects thrown at her concealed position were intrusions on privacy and autonomy accomplished without a single express threat of harm — yet they created precisely the risks the legislature described, on a night cold enough to kill. The General Assembly further found that "[s]talking conduct often becomes increasingly violent over time," and enacted the statute "to encourage effective intervention by the criminal justice system before stalking escalates into behavior that has serious or lethal consequences," intending "to hold stalkers accountable for a wide range of acts, communications, and conduct," including "a pattern of following, observing, or monitoring the victim, or committing violent or intimidating acts against the victim, regardless of the means." *Id.* The three-week arc pleaded here — the handwritten notice, the "you will be trespassed" threat, the coordinated approach, the escort, the live location reports, the employees held in place, the charge, the pursuit, and the stones — is that escalation, act by named act; and the "wide range of acts" the legislature enumerated maps one to one onto this conduct, from following and monitoring to intimidating acts, accomplished alike through police radios, telephone lines, and a shopping-center walkway. When a statute's preamble reads as a summary of the complaint, the fit between text and conduct is not an analogy but an identity.

**91.** The City's own published criteria regarding its DCSD (HEART) team — mental health crisis, suicide threat, behavioral-health concerns, trespass, welfare check — describe categories of human situations. Not one describes a person on a laptop. All-day presence as a customer is lawful — North Carolina has no loitering offense that reaches a patron inside a business, and Panera's own Sip Club product invites lingering; a single gym bag is the opposite of a weapon indicator; working on a computer is the opposite of a behavioral-health presentation. What was dispatched to Plaintiff was a behavioral-health response to a presentation that met none of its criteria.

### *i. Course of Conduct*

**92. Course of Conduct**—A "course of conduct" means two or more acts directed at a specific person, including acts committed directly, indirectly, or through third parties. 18 U.S.C. § 2261A(b); N.C.G.S. § 14-277.4A(b)(1). Defendants' course of conduct spans more than two weeks and includes at minimum: (a) the October 29, 2026 clothing confrontation and handwritten notice; (b) the November 7–8, 2026 threat, delivered by the manager and her supervisor, that Plaintiff "will be trespassed" without reason; (c) the coordinated approach of Officer 1 and the two HEART responders at 8:04 p.m. on November 14, 2026; (d) the identification demand and encirclement inside the restaurant; (e) the escort and the "you're still on Panera property" pursuit to the property line; (f) the manager's evasion and the employees' coordinated recording at 8:17–8:28 p.m.; (g) the manager's 9:21 p.m. telephone call reporting Plaintiff's live position while employees were held in place; (h) the charge

by Officers 2 and 3 at 9:31 p.m.; (i) the pursuit; and (j) the search of the ditch, including objects directed at Plaintiff's concealed position. Each act was directed at Plaintiff; several were performed through third parties acting in concert, a modality both stalking statutes expressly reach.

**93. Stigma injury**. Being publicly processed as a mentally ill, possibly homeless crisis subject — on police body cameras, in your profession's town, while holding a laptop and a paid membership — is a dignitary harm that requires nothing else to be wrongful. The label, especially if not true, is the injury. This is why the damages case survives even if every physical fact were disputed: the processing is documented.

**94. The Interstate-Commerce Nexus**—Each act in the course of conduct was executed through facilities of interstate commerce: the 911 telephone system through which the calls were placed and dispatched; the officers' radio and computer-aided dispatch network; and the cellular telephony through which Plaintiff was located, recorded, and pursued. The telephone system is precisely the "facility of interstate commerce" that sustains federal stalking prosecutions in purely local cases; the same nexus that would expose private stalkers to federal prosecution exposes state and private actors here.

**95. Intent to Harass and Intimidate**—The course of conduct objectively manifests an intent to harass and intimidate — the same objective-intent inquiry the Supreme Court applied in Torres v. Madrid, 592 U.S. 306, 317 (2021): whether the challenged conduct "objectively manifests an intent to restrain." A warning delivered at 8:04 p.m. required three acts: deliver it, document it, leave. What followed — sarcasm ("hooked up with resources, sweetie?!"), an encirclement, an identification demand, an escort to the property line, a second call, live location reporting, employees held in place, a sprinting charge accompanied by "come here, you jerk," and objects thrown at a concealed person's position — bears no rational relationship to any lawful governmental or commercial purpose. It is the pattern of conduct those statutes were written to describe.

**96. No Legitimate Purpose**— The stalking statutes require that the harassing conduct serve "no legitimate purpose." The City will likely say the caller supplied the purpose — that its personnel merely reacted to what the manager reported. That defense fails for four reasons, each grounded in the City's own documents and this Complaint:

a. According to the May 31, 2023 Durham Holistic Empathetic Assistance Response Teams (HEART) Pilot Program Report (prepared by RTI International for the Durham Community Safety Department, covering June 28, 2022, through March 31, 2023)[4], self-initiated responses to involuntary commitments occurred through the Co-Response Team (COR) rather than the unarmed Community Response Team (CRT). Responses to involuntary commitments routed through the Co-

[4] RTI International, Durham HEART Pilot Program Report (May 2023).

Response team rather than the unarmed CRT widens rather than narrows the space for the City's defense.

b. **First**, the label was the City's product, not the caller's. The call-taker's scripted questions, the call-nature codes, and the conditional logic that assigned a behavioral-health response are the City's own machinery, adopted by the City and operated by the City. A system that accepts a caller's characterization of a person — without any verification, any observation, or any safeguard — and converts it into a crisis response is a system that manufactures purposes out of unverified words. The City chose that design. A purpose produced by a machine the City built, from words nobody checked, is not a "legitimate purpose"; it is purposeless conduct with official credentials.

c. **Second**, the configuration of the response disproves the "mere response to a call" account. By the City's own published criteria, a bare trespass or welfare call draws the unarmed three-person Community Response Team — clinician, peer specialist, EMT, no police officer. Durham HEART Program Summary (Nov. 2022); RTI International, HEART Pilot Program Report (May 2023). What appeared at Panera Bread at 8:04 p.m. was a police officer and two HEART personnel — a configuration matching the City's joint response models: the Co-Response team (CIT-trained officer plus clinician), reserved for calls "that may pose a higher safety risk,"[2] and the Involuntary Commitment Response Team, whose own protocol pairs a clinician and an EMT with law enforcement — and which operates when requested by first responders on the scene, with law enforcement handling "the legal custody and transport aspects of an IVC order" while the clinician conducts the on-site first evaluation (¶¶ 57–58, 60–61). A caller cannot order that configuration. Only the City's dispatch apparatus can. The team's composition is therefore documentary evidence that someone in the City's chain classified this encounter as a crisis-custody event — on a presentation (a quiet customer, a laptop, one gym bag; ¶¶ 22, 24, 26, 54) that met none of the criteria for one, and at an hour when the City's own 2022 program summary shows the co-response tier did not ordinarily operate at all. If the City defends the response as welfare or care, the question writes itself: where was the ambulance? Care that never summons medical transport wasn't medical care — it was the costume without the medicine.

d. **Third**, the script matches the custody pathway, not the trespass pathway. A trespass warning requires three acts: deliver it, document it, leave. What the responders performed instead maps item-for-item onto the involuntary-commitment intake: an identification demand (¶ 22) — identity is the first entry of any custody or evaluation paperwork, and is irrelevant to a trespass warning; an encirclement the Complaint pleads as a coercive show of governmental authority (¶ 64); a "resources" inquiry — the intake question (¶ 24); body-camera documentation (¶

54); and an escort to the property line (¶ 26). The caller may have supplied words. The configuration and the script are the City's own, and they fit a purpose the law does not recognize as legitimate: taking a compliant customer into custody for an evaluation she never needed, under criteria she never met. That is "no legitimate purpose" — proven not by what Plaintiff failed to show, but by what they brought: a custody apparatus to a non-custody situation.

e. The hybrid itself confesses. Trespass and welfare cannot both be purposes — a business excludes the person it wants gone and helps the person it believes needs help. Performing both simultaneously is the signature that neither purpose was genuinely held. A defendant with a legitimate purpose can say what it was in one sentence. No defendant here ever has.

f. Whether the mixing occurred in the dispatch center or on the sidewalk will be established by the CAD unit assignments, AVL data, and body-camera records already requested (¶ 43) — and either answer has a defendant attached.

***ii. Knowledge and result***

**97.** Defendants knew or should have known the conduct would cause a reasonable person to fear for her safety and suffer substantial emotional distress, and it did in fact cause both. Plaintiff's terror was visible and stated; she announced her fear at 8:04 and her intent to report; she fled at a full sprint documented on her own recording; she concealed herself for three to four hours in freezing conditions, motionless, without calling 911 — because the only help 911 could summon was the help she was hiding from. Her substantial emotional distress is corroborated by contemporaneous video, by physical injuries sustained in the flight, by documented cold exposure, and by her own device's physiological and location data.

**98. Reasonable-Person Fear and Substantial Emotional Distress — Actual —** A reasonable person subjected to this course of conduct would fear for her safety and suffer substantial emotional distress; Plaintiff in fact did both. Her terror was visible and stated at 8:04 p.m.; it was recorded — her flight at full sprint, on video with the officers' own shouts as audio; it held her motionless in freezing temperatures for three to four hours; it kept her from calling 911 because the only help 911 could summon was the help she was hiding from; and it kept her in hiding for hours after. Her distress is corroborated by contemporaneous video, physical injuries sustained in the flight, documented cold exposure, and her own device's physiological and location data.

**99. State Action and Conspiracy —** The course of conduct was carried out jointly by state actors (Officers 1, 2, and 3; the HEART responders; and the dispatch personnel who classified and assigned the response) and by private actors (the Panera manager, supervisor, and employees) who were willful participants in joint activity with them. United States v.

Price, 383 U.S. 787, 794 (1966); Dennis v. Sparks, 449 U.S. 24, 27–28 (1980); Adickes v. S. H. Kress & Co., 398 U.S. 144, 152, 157–58 (1970). "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law." Where the conspiracy to stalk is effected through state personnel and state dispatch machinery, the entirety of the course of conduct is state action, and every participant is amenable to § 1983 liability.

**100.** The constitutional rights thus deprived include the right to bodily integrity and security of the person, the right to be free from unreasonable seizure (Count II), and — as to the pursuit and ditch conduct that escaped physical seizure — the right to be free from conscience-shocking executive action (Count III). The stalking statutes supply what constitutional doctrine requires and the bare counts lacked: a legislatively defined course of conduct, an objective intent standard, and a proven pattern spanning weeks rather than moments.

**101.** The City is liable under Monell for this injury in the manner pleaded in Count VI: its dispatch criteria attach a behavioral-health classification on a caller's word alone, without verification or safeguard; its crisis responders are trained to carry that classification into encounters; and its failure to train officers and responders on the limits of pursuit, force, and harassment against nonviolent, departing persons caused this course of conduct to be inflicted on a quiet customer.

**102.** **WHEREFORE**, as to Count IX, Plaintiff requests judgment against all Defendants, jointly and severally, for compensatory and punitive damages, declaratory relief, costs, and such further relief as the Court deems just.

### J. COUNT X — Civil No-Contact Relief (N.C.G.S. ch. 50C; motion under § 50C-2(a)).

**103.** Plaintiff incorporates by reference all preceding allegations as though fully set forth herein, including the course of conduct pleaded in Count IX (¶¶ 88–93) and the verification supplied by the Affidavit of Claudia A. Minoiu filed with this Complaint.

**104.** Plaintiff is a victim of "unlawful conduct" within the meaning of N.C.G.S. § 50C-1, because she is a victim of stalking as defined in that section: on more than one occasion, Defendants followed, monitored, observed, surveilled, threatened, and communicated to and about her without legal purpose, with intent to torment, terrorize, or terrify, conduct that in fact caused her substantial emotional distress. No personal relationship exists between Plaintiff and any individual Defendant; Chapter 50C exists precisely for this circumstance, supplying the remedy Chapter 50B withholds.

**105.** N.C.G.S. § 50C-2(a) authorizes a victim of unlawful conduct to seek relief "by filing a verified complaint in district court or by filing a motion in any existing civil action." This Count constitutes that motion in this existing civil action, brought within this Court's

supplemental jurisdiction under 28 U.S.C. § 1367. The verification required by § 50C-2(b) is supplied by Plaintiff's Affidavit, which attaches the course of conduct act by act and swears to the resulting fear and distress.

**106.** Plaintiff requests entry of a civil no-contact order, on notice and after hearing (or ex parte and temporarily pursuant to the Court's equitable powers, N.C.G.S. § 50C-6, pending that hearing), enjoining the individual Defendants, their agents, and persons acting in concert with them from: (a) contacting Plaintiff by any means, directly or through third parties; (b) following, surveilling, monitoring, or observing Plaintiff; (c) appearing at or near Plaintiff's residence, workplace, or any location where she is present; and (d) communicating with her employers, providers, or family about her.

**107.** The order carries a statutory consequence Defendants should understand before acting again: a course of conduct violating a court order prohibiting it is stalking elevated to a Class H felony. N.C.G.S. § 14-277.4A(d). Entry of this order therefore converts any repetition of the conduct pleaded above from a misdemeanor pattern into a felony, and any post-order contact into evidence tampering with a protected witness in a pending federal action.

**108.** **WHEREFORE**, as to Count X, Plaintiff requests (a) a temporary civil no-contact order pending hearing; (b) a permanent civil no-contact order upon hearing; (c) such other relief as the Court deems just; and (d) leave to present the criminal referral to the appropriate state authorities.

**109.** I verify the allegations of Count X of the Complaint under oath as matters within my personal knowledge."

## VI. PUNITIVE DAMAGES

**110.** Plaintiff seeks punitive damages against the individual defendants under 42 U.S.C. § 1983, *Smith v. Wade*, 461 U.S. 30 (1983), and under N.C.G.S. § 1D-15, on account of conduct done with malice, willfulness, and reckless indifference, including the shouted charge, the pursuit, and the thrown objects at her concealed position.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court:

a. Enter judgment on the claims established at trial;

b. Award compensatory damages for physical injury, emotional distress, humiliation, and reputational and dignitary harm;

c. Award punitive damages against the individual defendants as permitted by law;

d. Enter declaratory judgment that the conduct of Officers 2 and 3 violated Plaintiff's constitutional rights;

e. Award attorney's fees and costs under 42 U.S.C. § 1988 to the extent permitted;

f. Order preservation and production of the records identified herein; and

g. Grant such further relief as is just.

## VIII. RELATED CASE STATEMENT

### A. Related case: Minoiu v. D. Burnside—*Filed*, No. 1:26-cv-01283 (M.D.N.C.)

**111.** Related case: *Minoiu v. D. Burnside*, No. 1:26-cv-01283 (M.D.N.C.) — separate defendants (Duke University Campus Police, a private university police department), separate events; this action arises from events of November 14, 2026.

**112.** The undersigned certifies that this Complaint is submitted in good faith and that its factual contentions are supported by the exhibits and records described herein or specifically identified as subject to confirmation through the discovery and public-records process.

### B. Criminal Referral – Elon Musk

**113.** Separately from this action, on November 19, 2026, Plaintiff submitted to the Federal Bureau of Investigation a sworn statement reporting physical events experienced between 2014 and 2026, including most recently, on the night of November 14–15, 2026,[5]

[5] *See* attached affidavit.

together with publicly available reporting concerning Elon Musk' Starshield Satellite Network, discussing the related directed-energy capabilities and classified satellite emissions, and requesting evaluation by the team able to access any classified materials implicated.[16] No claim in this Complaint is predicated on those events or on any matter described in that statement; the statement is identified here solely to preserve the record of its existence, its date, and its preservation requests. *See attached* as **<u>Exhibit S</u>**, Criminal Referral to the Federal Bureau of Investigation (Charlotte).

### C. Future Claim (to be filed November 20, 2026)

**114.** Involuntary commitment and assault UNC Rex Hospital, Raleigh, NC, Holly Hill Hospital, North Carolina.

[6] A copy of the statement, with its attachments and the Bureau's tip or case number (once available), will be supplied to the Court upon request.

## IX. SIGNATURE AND COMPLIANCE WITH FED. R. CIV. P. 11(a)

Respectfully submitted,

______________________________

**By:** Claudia A. Minoiu [*Pro Se*] [7]
**Date:** November 19, 2026

[7] c/o Oak City Cares, 1430 S. Wilmington St., Raleigh, NC 27703 | Claudia.Minoiu.jd@gmail.com | (531) 350-7504

## X. EXHIBIT INDEX[8]

**Exhibit A:** Video "Chased by Police" (IMG_1502, from 9:21PM): running; audio of officers shouting "Come here you! Come here you jerk!;" ends at ditch location

**Exhibit B:** Photograph of HEART responder at exit, 8:08PM (HEART logo visible)

**Exhibit C:** Photographs of employees recording Plaintiff, 8:19–8:28PM

**Exhibit D:** Video frames: manager at window during 9:21PM call (visual tracking)

**Exhibit E:** Photographs of ditch area and recovered mouse

**Exhibit F:** Photograph of palm puncture wound (gravel)

**Exhibit G:** October 29, 2026 handwritten notice re: shirt ("to be covered up")

**Exhibit H:** Sip Club membership confirmation (active November 1, 2026)

**Exhibit I:** November 13, 2026 lunch confirmation (served at the same store)

**Exhibit J:** City of Durham FAQ — Co-Response dispatched to "higher risk for violence" calls

**Exhibit K:** City Community Safety page — IRT unit; HEART unit descriptions

**Exhibit L:** HEART program evaluation excerpts — triage criteria; on-scene resolution statistics

**Exhibit M:** Weather table — first-freeze night of November 14–15, 2026; 44°F at 8:48PM device screenshot

**Exhibit N:** Location/route photographs and maps (Panera, 9th Street stairs, 8th/9th Alleys, ditch)

**Exhibit O:** Route map: Panera to DPD headquarters, 602 E. Main Street (2.7 mi)

**Exhibit P:** Timeline with video minute marks (9:21PM start; charge at 6:31; ditch at 7:10)

**Exhibit Q:** November 17, 2026 public-records request and § 132-1.4A petition (records posture)

---

[8] Plaintiff is submitting this Complaint on an emergency basis due to threats to her personal safety, which have created extraordinary time constraints and prevented her from properly organizing, labeling, and attaching the supporting exhibits. Plaintiff possesses the documentary, photographic, audiovisual, and other evidence identified herein but has been unable to prepare and submit those materials contemporaneously with this filing. Plaintiff respectfully requests leave to supplement the record with the supporting exhibits as soon as practicable, subject to the Court's applicable procedural requirements, and asks that the Court consider the exigent circumstances necessitating this emergency filing.

**Exhibit R:** Evidence of Third Party Unauthorized Access of my computer; evidence that my laptop and Microsoft and Google accounts were hacked—to be assembled and provided in subsequent filing.

**Exhibit S:** Criminal referral to the FBI re: Elon Musk's Starshield National Security Satellite Network

**Exhibit T:** Affidavit